IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 19, 2023 at Knoxville

**STATE OF TENNESSEE v. PERCY D. THOMPSON**

**Appeal from the Criminal Court for Davidson County**
**No. 2020-B-1005     Mark J. Fishburn, Judge**

_____

**No. M2023-00051-CCA-R3-CD**

_____

Defendant, Percy D. Thompson, was indicted by a Davidson County Grand Jury for the attempted first degree murder (count one) and aggravated assault (count two) of his wife. Following a bench trial, Defendant was convicted of the lesser included offense of attempted second degree murder in count one, and aggravated assault as charged in count two. The trial court sentenced Defendant to twelve years for count one and ten years for count two and merged the aggravated assault conviction into the attempted second degree murder conviction. Defendant appeals his convictions arguing the trial court failed to find him guilty of aggravated assault at the conclusion of the proof and therefore erred in sentencing him for count two and that the evidence was insufficient to support either of his convictions. Following our review of the record, including the briefs of the parties and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and TOM GREENHOLTZ, JJ., joined.

Daniel J. Murphy, Lewisburg, Tennessee (on appeal), and Erin D. Coleman, Nashville, Tennessee (at trial), for the appellant, Percy D. Thompson.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Lody R. Powers, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

On February 16, 2020, the victim visited her mother, Ms. Thereasa Howse, after church. Ms. Howse had kept the children of the victim and Defendant for the weekend. Ms. Howse initially recalled the victim visiting her around 11:00 a.m., but later acknowledged her "timing was off" when she remembered that the victim's "church lets out around 1:00 [p.m]." Ms. Howse stated that the victim "didn't appear to be happy at all" during the visit. Later that day after the victim had returned home, she called Ms. Howse and asked her to come over because she and Defendant were not "getting along" and their children were home. When she arrived, the victim and the children were in the victim's vehicle parked in the driveway. Defendant was also in the driveway getting in his car, and he and the victim "had some words." Ms. Howse told Defendant and the victim to "stop in front of the kids and for him to go on and cool off." Defendant left at that point.

When Defendant returned thirty to forty minutes later, the victim tried to keep him out of the house by re-locking the door each time he turned his key. When Defendant finally unlocked the door, he went upstairs and took off his shoes, jacket, and a gold necklace that he was wearing. He came back downstairs and began "rambling" and "pushed" the victim's head with his finger, which started an argument between Defendant and Ms. Howse. They were "going back and forth," and Ms. Howse left to go get her weapon from her vehicle because she was "afraid for [Defendant], and myself and [the victim] because he looked very upset. He looked very angry, and I was not going to let him hit her or me." She also retrieved a can of wasp spray which she kept for self-defense. When she returned to the home, Defendant and the victim were "going back and forth" and the children were crying. Ms. Howse told the oldest child to take the two younger children upstairs and not to come back down. The victim took off running, Defendant ran after the victim, and Ms. Howse ran after him, but could not keep up. Defendant caught up to the victim, pulled her to the ground, and punched her in the face. Ms. Howse was "about two houses" away and when she finally caught up to them, the victim was unconscious on the ground, and Defendant was continuing to hit her and "blood and stuff was just coming out everywhere." Ms. Howse sprayed Defendant in the face with the wasp spray. Then, she pulled out her gun, but could not get it to operate. She could not remember if that was before or after Defendant started running.

Ms. Howse could not get her daughter up off the ground and realized she did not have her cell phone with her to call 911, so she went back to her car in the driveway to get her cell phone and called 911. The 911 call was played for the trial court. Ms. Howse told the operator that Defendant "chased my child, she was running, and he knocked her down on the ground, and he beat her, and now he's down there holding her, and I can't get this

- 2 -

safety off this gun." She then saw Defendant pick up the victim and walk up the street with her in his arms. Defendant placed the victim on the ground leaning against Ms. Howse's vehicle. Defendant went inside the house, came back with some clothes which he put in his car and drove off. After Defendant left, Ms. Howse helped the victim into the backseat of her car, where she remained until first responders arrived.

Ms. Howse also testified that her grandson had called her to the victim's home in December 2019 when the victim and Defendant had an altercation. Her grandson had also called the police. Following that incident, the victim and one of the other children were transported to the hospital by ambulance and Defendant was arrested.

On cross-examination, Ms. Howse admitted that at the preliminary hearing in this case, she testified that the children were in the car and not upstairs when the victim ran down the street with Defendant following her. She also testified at the preliminary hearing that she sprayed Defendant with pepper spray and held the gun to his face at some point.

On February 16, 2020, Stephanie Miller, a neighbor of the victim and Defendant, heard screaming outside. When she looked out of her window, she saw the victim, who appeared to be unresponsive, on the ground, so she called 911. The 911 call was played for the trial court. Ms. Miller saw Defendant walk away from the victim, but then he came back and began dragging the victim before picking her up to carry her back toward the house "on the corner[,]" which was the victim's home. The victim was eventually able to slowly walk, but Ms. Miller did not see how the victim got to the ground. She admitted she did not see anyone other than the victim and Defendant. Ms. Miller saw Defendant get into a black Nissan Versa and leave the scene with no lights on.

Metropolitan Nashville Police Department ("MNPD") Detective Melissa Flores responded to the 911 call and "tr[ied] to communicate [with the victim] to like keep her up, to wake her up, but there was nothing." Detective Flores took several photos of the scene which showed blood on Ms. Howse's car and on the sidewalk. Detective Flores did not recall if a can of wasp spray was recovered or if any weapons were confiscated because she "went straight to the car" and then traveled to the hospital with the victim.

When Taylor Roper, a paramedic with Nashville Fire Department, arrived at the scene, the victim was "semi-responsive[;]" however "[t]hroughout the transport, her mental state decompensated to the point where she was not responding much to us at all." The victim's pre-hospital report, prepared by Ms. Roper and entered into evidence, noted that the victim's Glasgow Coma Scale (GCS) declined during transport. Ms. Roper explained that the GCS is "a quantitative measure of how we document our findings of a patient's mental state." Ms. Roper assumed that the victim's GCS declined "because of trauma, whether it be blood loss or neurological injury."

MNPD Officer Gabriel Centeno responded to the scene with Detective Flores. Officer Centeno testified that he was "made aware that [Defendant] was driving a vehicle. We obtained the vehicle tag. The tag came back to an address in Madison[, Tennessee]." Officer Centeno called Madison Police Department ("MPD") officers and determined that Ms. Peggy Thompson, Defendant's mother, lived at the address. MPD officers detained Defendant and transported him to a meeting point Officer Centeno had arranged. Officer Centeno took photographs of Defendant which showed an injury to Defendant's right hand and blood on his shirt. The photographs were admitted into evidence. Officer Centeno described Defendant as "not crying. Not upset. Just hostile." Officer Centeno also recalled Defendant's asking about the victim's condition, but felt it was not from a "place of concern. More of information." The officers debated removing Defendant's handcuffs to photograph his hands, but because Defendant kept trying to pull away and resisting, they decided to keep Defendant handcuffed.

Ms. Thompson[1] recalled Defendant arriving at her house unannounced and visibly upset. Defendant did not immediately tell her what happened, but eventually told her Ms. Howse had pulled a firearm and "what happened . . . when he caught up with [the victim]. And then he realized what he was doing, and he stopped and . . . lifted her up and brought her back to the house." Ms. Thompson said that Defendant went with the officers peacefully and did not resist arrest.

MNPD Detective Nathaniel Ellsworth responded to the hospital. He was in the victim's room speaking with his sergeant and Detective Flores when they were asked to leave because "something happened medically[.]" Prior to being asked to leave, Detective Flores had taken photographs of the victim in the hospital. Those photographs were entered into evidence and showed extensive swelling across the victim's entire face, especially her left eye. The victim had blood covering her face and she was intubated.

Detective Ellsworth described Ms. Howse as "highly upset" when he interviewed her in the family waiting area at the hospital. After speaking with Ms. Howse, Detective Ellsworth made the decision to charge Defendant with attempted first degree murder and aggravated assault, and he wrote the warrants for Defendant's arrest. Detective Ellsworth admitted that it was not normal protocol to move forward with charges without speaking to the victim first, but "[a]fter looking at [the victim's] injuries, and . . . speakin[ing] with the doctor, it was the decision by me and my sergeant to go ahead and put the charges on him at that level." Before leaving the hospital, Detective Ellsworth took photographs of Ms. Howse's car showing blood smeared along the outside of the vehicle.

---

[1] Ms. Thompson testified by telephone without objection.

At trial, the victim testified that she had "no memory of what happened between me and [Defendant]. I just know I remember being in the back of the truck and waking up in the hospital [the next day]." When she woke up in the hospital, she was unable to speak because she was "kind of chained to the bed, and there was a thing in my throat." She was in the hospital from Sunday, the day of the offense, through the following Saturday. The victim's medical records showed that the doctor recorded her pain score three days after the offense as an eight out of ten; however, she had "no memory of pain." The victim agreed that her medical records contained an accurate list of her injuries: "orbital floor (blow-out) close fracture[,]" "lamina papyracea fracture[,]" "nasal bone fracture[,]" "facial laceration[,]" "traumatic mudriasis[,]" "corneal abrasion[,]" "acute traumatic pain[,]" "inadequate oral intake[,]" "open fracture of left orbital floor[,]" and an "orbital floor deformity due to trauma, left[.]" The victim returned to the hospital twelve days after the offense for surgical repair of her left eye socket which required a titanium plate. On that date, her "[l]eft pupil remain[ed] fixed and dilated around 6 mm and [was] not reactive to light. Extraocular movements [were] very limited on the left[.]" In addition to the eye surgery, the victim had significant scarring which was treated with steroid shots. The steroid shots caused her face to "encave because of the steroid. And so[,] I had to go see a plastic surgeon[.]" She also had to get two back injections. The victim acknowledged that in December 2019, police were called to her house in response to a domestic incident; she and her middle child were transported to the hospital, and Defendant was arrested.

Mr. Terry Faimon, the director of communication research court liaison for the District Attorney's office, identified three recorded jail calls made between February 17, 2020, and March 10, 2020, as being associated with Defendant's PIN number. The calls were played for the trial court. In these calls, Defendant spoke primarily with his mother, and occasionally with his father. In the first call, Defendant asked Ms. Thompson to pick up his clothing before it was ruined and also asked what the news had said about the incident. Ms. Thompson told him that the victim remained unconscious in the hospital. In the second call, Defendant said that he "almost got away clean." In the third call, Ms. Thompson told Defendant the victim had a broken eye socket and that "one eye is out." Defendant told Ms. Thompson that Ms. Howse had been in court and she is "nothing but a liar." Defendant said what he did to the victim was "unexplainable," and he "broke down crying" when he saw the pictures of the victim. Defendant wanted to contact the victim, but said that he would wait about a month so the victim could "calm down." He asked Ms. Thompson to "three-way" the victim the next time he called her, but Ms. Thompson refused. Defendant said that the victim needed to understand that Ms. Howse "always [being] in our business is causing most of our problems."

After a *Momon*[2] colloquy, Defendant chose not to testify. Ms. Thompson testified regarding what occurred at her house on the night of the offense. After the conclusion of all evidence, the trial court found Defendant guilty of aggravated assault as charged in count two:

> Let's get rid of the obvious that was proven without any question beyond a reasonable doubt, and that's the serious bodily injury and the fact that it was inflicted upon [the victim] by [Defendant]. As you yourself can see, he's guilty of the aggravated assault by serious bodily injury. And the court makes that finding and finds him guilty of that.

Regarding count one, attempted first degree murder, the trial court found that the State failed to establish premeditation and intent. The court noted that Defendant was unarmed, there was no evidence of animosity in the days preceding the incident, no preparation for the attack, Defendant carried the victim to where Ms. Howse could care for her, and he immediately asked about the victim's condition when the police arrived. Ultimately, the trial court found Defendant guilty of the lesser included offense of attempted second degree murder stating, "So while I do not find that there's premeditation, I do find that his acts were intentional and that he knew the consequences of his acts could be that she would die as a result of it."

At Defendant's sentencing hearing on July 20, 2022, Defendant testified along with his pastors, his father, and the victim. All of the witnesses testified that Defendant would not benefit from incarceration because he had made significant strides in rehabilitating himself since the offense. Defendant asked the court to "find it in his heart to spare my life so that I can continue to help others" and said that it was "[d]rastically an understatement" to say he was sorry for what happened. Defendant spoke about the support that he had in his community through his church, and the relationships he had with the victim, his children, and his father.

The State introduced Defendant's presentence report (PSR) which included certified convictions for vehicular homicide by intoxication, vehicular assault, reckless aggravated assault, reckless endangerment with a deadly weapon, and leaving the scene of an accident involving death. The PSR also included a victim impact statement in which the victim stated that she did "not favor imprisonment due to the fact I will not receive . . . financial contributions with my children and [Defendant] needs mental help and addiction help."

---

[2] *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999) (establishing the standard of knowledge a defendant must demonstrate to waive their constitutional right to testify).

MNPD Detective Abigail Malone also testified at the sentencing hearing and recalled responding to the victim's house at least twice before this offense, including in December 2019 for a domestic disturbance. The victim did not ask for an order of protection on that date. Detective Ellsworth testified at the sentencing hearing that he has worked many domestic violence cases and was not surprised by the victim's refusal to participate in the investigation because "[i]t's a pattern of behavior that victims of domestic violence exhibit[.]"

After hearing all testimony and arguments from the State and Defendant, the trial court indicated that it did not believe Defendant was eligible for an alternative sentence but gave the parties "a week or two to try and come up with some legal authority because I don't think he can. If you can come up with it, I will consider it." On August 24, 2022,[3] the trial court entered judgments sentencing Defendant to twelve years for attempted second degree murder and ten years for aggravated assault, and merged the aggravated assault into the attempted second degree murder conviction.

Defendant filed a motion for new trial on September 21, 2022, and an amended motion for new trial on November 15, 2022, arguing in part that the trial court erred when it sentenced Defendant for aggravated assault because it did not find Defendant guilty of the offense. In its response, the trial court stated that "[a]lthough the court regrettably overlooked ruling on count [two]," it maintained jurisdiction over the case and found "its oversight to be more akin to taking a matter under advisement than a verdict of not guilty." The trial court denied Defendant's motion.

Defendant filed a timely appeal, now properly before this court.

**Analysis**

Defendant argues that the trial court erred when it sentenced him for count two because it failed to find him guilty of aggravated assault. The State contends that the trial court properly sentenced Defendant for count two because the transcript and the court minutes reflect entry of a guilty verdict. We agree with the State.

Defendant concedes that both the trial transcript and the court minutes clearly reflect that the trial court found Defendant guilty of aggravated assault. However, he asserts that the trial court's order denying his motion for new trial "openly acknowledges the opposite" and that the trial court's silence on count two functioned as an acquittal. This argument is

---

[3] It appears, based on the date of the judgments and the briefs of the parties, that the trial court held another sentencing hearing on this date. However, the record does not contain a transcript from this hearing, nor is there an order reflecting the trial court's reasoning for the sentences. This missing transcript does not affect our analysis because Defendant does not appeal the length or manner of his sentence.

without merit. First, despite what the trial court said in ruling on the motion for new trial, the transcript clearly reflects that the court found Defendant guilty of aggravated assault as charged in count two. Further, as stated by our supreme court, "the court minutes are the highest evidence of what is done in the court, . . . and are conclusive unless attacked for fraud." *State v. Byington*, 284 S.W.3d 220, 225-226 (Tenn. 2009) (quoting *Dyer v. State*, 79 Tenn. 509, 514 (Tenn. 1883)). The court minutes in this case clearly reflect that the trial court found Defendant guilty of aggravated assault as charged, and Defendant does not argue that the court minutes are fraudulent. Defendant is not entitled to relief on this issue.

Defendant next argues that the evidence is insufficient to support either of his convictions. Defendant contends that the State did not introduce sufficient proof to establish that he acted with "the intent to knowingly kill the victim[,]" or that the victim was "ever on the verge of dying or on life support." Defendant further contends that Ms. Howse's testimony at trial was inconsistent with her preliminary hearing testimony and statements to 911 such that it was "so improbable or unsatisfactory as to create a reasonable doubt" of Defendant's guilt. The State asserts that Defendant has waived this argument because he failed to adequately cite to the record in the argument section of his brief. Alternatively, the State argues that the evidence is sufficient to sustain Defendant's convictions. We agree that the evidence is sufficient to sustain Defendant's convictions.

Pursuant to Tennessee Rule of Appellate Procedure 27(a)(7), a defendant appealing a conviction must set forth an argument for each issue which includes "the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record[.]" Tenn. R. App. P. 27(a)(7). Further, any "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). As the State points out, Defendant does not cite to the record in the argument section of his brief. However, Defendant does cite to the record in his statement of facts and makes "appropriate references to the record" throughout his argument section to support his contentions. *See State v. Toles*, No. W2018-01175-CCA-R3-CD, 2019 WL 2167835, *10 (Tenn. Crim. App. May 17, 2019) (finding the defendant's arguments not waived because the statement of facts properly cited to the record in support of his arguments even though the argument section did not contain citations). Accordingly, Defendant's sufficiency argument is not waived, and we will address its merits.

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). The standard of review

is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). A "criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict" because "a verdict of guilt removes the presumption of innocence and raises a presumption of guilt[.]" *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (citing *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

"In a bench trial, the verdict of the trial judge is entitled to the same weight on appeal as a jury verdict." *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (citing *State v. Hatchett*, 560 S.W.2d 627, 630 (Tenn. 1978)). The judge evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the judge determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the [judge]." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

First, Defendant contends that the State relied on the "blatantly perjured" testimony of Ms. Howse to obtain both of his convictions. He argues that the inconsistencies between Ms. Howse's testimony at the bench trial, her preliminary hearing testimony,[4] and her statements to the 911 operator create reasonable doubt of his guilt. He further asserts that without her testimony, there is no other evidence that he was the person who inflicted the victim's injuries. Ordinarily, inconsistencies in witness testimony do not disturb a guilty verdict unless they are "so improbable or unsatisfactory as to create a reasonable doubt" of guilt. *Busby v. State*, No. M2012-00709-CCA-R3-PC, 2013 WL 5873276, *16 (Tenn. Crim. App. Oct. 30, 2013) (quoting *State v. Radley*, 29 SW.3d 532, 537 (Tenn. Crim. App. July 15, 1999)). Defendant correctly points out that the trial court recognized various inconsistencies in Ms. Howse's testimony regarding the location of the children during the

---

[4] We note that the trial transcript states that "a portion of the [preliminary hearing] recording was played" during the trial, but the record does not include the audio recording or a transcript of the portion played at trial. In his brief, Defendant indicates his intention to "amend" the appellate record to include this recording. However, no motion to supplement the record was filed. Thus, we will rely on the questions and answers that appear in the transcript of the bench trial.

altercation and whether she aimed her firearm at Defendant. However, after acknowledging these inconsistencies, the trial court found Defendant guilty, thus crediting Ms. Howse's testimony. *See Bland,* 958 S.W.2d at 659. The inconsistencies are not so improbable or unsatisfactory as to create reasonable doubt, and this court will not second guess the trial court's credibility determinations. *See Wagner*, 382 S.W.3d at 297. Defendant is not entitled to relief under this theory.

Second degree murder is a "knowing killing of another." T.C.A. § 39-13-210(a)(1). A person acts "knowingly" when he is "aware that the conduct is reasonably certain to cause the result[,]" even if the result is not his desire. T.C.A. § 39-11-302(b); *State v. Kelly*, 34 S.W.3d 471, 478 (Tenn. Crim. App. 2000). The trier of fact must determine whether a defendant acted "knowingly." *State v. Brown*, 311 S.W.3d 422, 432 (Tenn. 2010). Further, intent "may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act and from all the circumstances of the case in evidence." *State v. Inlow*, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000) (citing *State v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. Dec 30, 2013)).

> A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:
>
> (1)  Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

T.C.A. § 39-12-101.

As relevant to this case, an assault is committed when a person knowingly "causes bodily injury to another." *Id.* § 39-13-101(a)(1). Aggravated assault is the assault of another which results in serious bodily injury. *Id.* § 39-13-102(a)(1)(A)(i). Serious bodily injury includes "[p]rotracted unconsciousness," "extreme physical pain," and "protracted or obvious disfigurement." *Id.* § 39-11-106(a)(37). Further, "the distinction between 'bodily injury' and 'serious bodily injury' is generally a question of fact for the jury and not one

of law." *State v. Love*, No. E2011-00518-CCA-R3-CD, 2011 WL 6916457, *4 (Tenn. Crim. App. Dec. 28, 2021) (quoting *State v. Barnes*, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. Feb. 28, 1997)).

Relative to both convictions, Defendant contends that there is no evidence, other than Ms. Howse's inconsistent testimony, that he was the one who caused the victim's injuries or "whether she sustained her injuries while face vaulting face forward to hard pavement." As stated above, this court will not second guess the trial court's finding that Ms. Howse's testimony was credible. Regardless, in addition to Ms. Howse's testimony, there is sufficient evidence to support a reasonable finding that Defendant caused the victim's injuries. Ms. Miller reported to the 911 operator that she saw a man with the victim get into a black Nissan Versa to drive away from the scene. That vehicle was registered to Ms. Thompson's house where Defendant was located. Ms. Thompson testified that Defendant was upset when he arrived at her house and he later informed her that he had attacked the victim until "he realized what he was doing, and he stopped[.]" When police arrested Defendant at Ms. Thompson's house, he still had blood on his shirt and had an injured hand. Further, Defendant admitted multiple times in the recorded jail calls that he was responsible for the victim's injuries. The evidence was sufficient to prove that Defendant caused the victim's injuries.

Defendant further asserts that the State failed to introduce evidence that the victim "was ever on the verge of dying or on life support" to support his conviction for aggravated assault. Defendant concedes in his brief that "it is true that the victim was unconscious as a result of her injuries." The evidence confirms that the victim suffered extensive injuries which required a six-day hospitalization and multiple surgical procedures. Detective Flores testified that the victim was unconscious when first responders arrived on scene, and Ms. Roper testified that the victim again became unresponsive during transport. The victim had no memory of the attack; she remembered "being in the back of the truck and waking up in the hospital." The victim remained unconscious and was intubated for several days. She had multiple facial fractures, extensive facial swelling, and soft tissue contusions and lacerations. While the victim did not recall her pain, the medical records indicate that several days after the attack, she had a pain score of eight out of ten.

Further, the victim's left pupil remained "fixed and dilated" for twelve days after the offense. *See State v. Stanton*, No. M2003-03049-CCA-R3-CD, 2005 WL 639139, *7 (Tenn. Crim. App. Mar. 17, 2005) (finding serious bodily injury when the victim suffered from loss of vision in one eye for over a week); *State v. Howard*, No. W2014-02488-CCA-R3-CD, 2016 WL 3131515, *7 (Tenn. Crim. App. May 26, 2016) (finding serious bodily injury when victim suffered a "fracture between her eye socket and her brain[,]" her eye was bruised and swollen shut, and she had loss of vision); *State v. Mosley*, No. M2022-00441-CCA-R3-CD, 2023 WL 2662352, *4 (Tenn. Crim. App. Mar. 28, 2023) (finding

serious bodily injury when the victim temporarily lost vision in her left eye, could not open her eye for multiple days, and experienced blurry vision when she could open her eye), *perm. app. denied* (Tenn. June 28, 2023); *State v. Baker*, No. M2018-02221-CCA-R3-CD, 2019 WL 4899761, *4 (Tenn. Crim. App. Oct. 4, 2019) (finding serious bodily injury when "the victim suffered a broken nose and a fractured orbital bone"). The extensiveness of the victim's injuries, including her prolonged unconsciousness, and multiple fractures and surgeries, was sufficient evidence to support a finding that the victim suffered serious bodily injury.

Finally, regarding his conviction for attempted second degree murder, Defendant contends that the State failed to prove that he acted with the intent to knowingly kill the victim. While the trial court did not specify which section of criminal attempt it applied in its analysis, the evidence supports the trial court's finding beyond a reasonable doubt that Defendant had the intent to commit a knowing killing and took a substantial step toward that goal. *See* T.C.A. § 39-12-101(a)(3); *State v. Miller*, 638 S.W.3d 136, 160 (Tenn. 2021) ("To prove *attempted* second-degree murder, the State was required to prove that the defendant took a substantial step toward committing a knowing killing of Mr. Austin. . . . Thus, as for the defendant's intent, the State was only required to prove that the defendant knew his actions were reasonably certain to cause Mr. Austin's death." (emphasis in original)). The evidence showed a history of domestic violence between the victim and Defendant. Defendant argues that he was provoked, but there is no proof of provocation by the victim; the only proof of provocation was by Ms. Howse who sprayed Defendant with wasp spray and retrieved her firearm. Defendant ran after the victim and after catching her, "slung" her to the ground and repeatedly struck her, causing the serious injuries discussed above. Defendant claims that he attempted to save the victim by carrying her back to the house; however, his argument ignores the fact that he caused the victim's injuries and he was seen dragging the victim up the street.

The evidence was sufficient to support Defendant's convictions for attempted second degree murder and aggravated assault. Defendant is not entitled to relief.

## Conclusion

For the foregoing reasons, we affirm the judgments of the trial court.

_____
JILL BARTEE AYERS, JUDGE

- 12 -